# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ELIZABETH BLACK,**
          **Plaintiff,**

    **v.**                             **Case No. 04C1230**

**LONG TERM DISABILITY INSURANCE,**
**MILWAUKEE WORLD FESTIVALS, INC.,**
**and STANDARD INSURANCE COMPANY,**
          **Defendants.**

---

## DECISION AND ORDER

Plaintiff Elizabeth Black served as the Executive Director of Milwaukee World Festivals, Inc. ("MWF"), from 1984 until 2003. As Executive Director of MWF, plaintiff planned, coordinated, and supervised numerous cultural, musical, and other entertainment events, including Summerfest, a two week summertime music festival recognized as one of the premiere music festivals in the country. As a benefit of her employment with MWF, plaintiff enrolled in an employee welfare benefit plan, known as Long Term Disability Insurance ("the Plan"), that provided long-term disability benefits to employees of MWF. MWF sponsored the plan and was the named plan administrator. The Standard Insurance Company ("Standard"), however, in addition to providing insurance benefits to enrollees in the plan, acted as the de facto administrator and made all determinations regarding eligibility for benefits.

In 2001, physicians diagnosed plaintiff with multiple aortic aneurysms. Plaintiff subsequently underwent surgery at the Cleveland Clinic to repair an ascending aortic aneurysm and aortic arch dilatation in a procedure known as an "elephant trunk repair."

After the surgery and recovery period, plaintiff returned to her job at MWF. She remained with MWF until August 2003, when she ceased performing most of her duties, citing health reasons. Her contract with MWF expired on December 31, 2003 and was not renewed.

Also in August 2003, plaintiff filed for long-term disability benefits under the Plan. Standard denied plaintiff's claim for benefits on March 31, 2004. Plaintiff unsuccessfully appealed the denial of benefits through Standard's internal appeals process.

Plaintiff, having exhausted the internal appeal procedures at Standard, then brought the present action seeking relief under the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. On June 21, 2005, I dismissed Standard as a defendant. On January 17, 2006, I determined that the Plan's denial of plaintiff's application for benefits would be reviewed under the arbitrary and capricious standard. On February 27, 2006, I dismissed one of plaintiff's claims. Before me now are the parties' cross-motions for summary judgment on plaintiff's denial of benefits claim. For the reasons that follow, I will grant defendant's motion and deny plaintiff's motion.

## I. FACTS

### A. Plaintiff's Employment with MWF

As Executive Director, plaintiff managed MWF. Her job required her to supervise personnel, raise money, discuss contracts and obligations in connection with the festivals and events, implement the orders and policies of MWF's board of directors and report to the board. On August 6, 2003, plaintiff notified MWF that because of health reasons, she needed to cease performance of all but the ceremonial functions of her job. On September 16, 2003, plaintiff ceased all work at MWF and went on medical leave. Plaintiff, however,

continued to receive her salary from MWF according to the terms of her employment contract until December 31, 2003, when plaintiff's unrenewed employment contract with MWF expired.

**B.    Plaintiff's Medical History and Concurrent Employment Events**

Prior to 2001, plaintiff was relatively healthy, suffering only from hypertension. In February 2001, plaintiff underwent a physical examination that revealed certain vascular abnormalities that upon further examination were diagnosed as aortic aneurysms of the ascending aorta, continuing into the aortic arch, and of the descending thoracic aorta. In March 2001, plaintiff underwent surgery to repair the aneurysm of the ascending aorta and aortic arch through the surgical placement of a graft. Plaintiff declined a simultaneous surgical repair of the descending aortic aneurysm, believing that the risk the aneurysm posed to her health at that time was not sufficiently large to justify the risk inherent in that particular operation. Nonetheless, the operation that plaintiff elected, an elephant trunk repair, included the attachment of a Dacron graft to plaintiff's aorta that would facilitate any future surgical repair of the descending aorta, should such repair become medically necessary.

Subsequent to the surgery, plaintiff's physicians continued to monitor her blood pressure and aneurysm through appointments and imaging procedures. Thus, plaintiff met with her physicians, including her cardiologist Dr. David Slosky and a cardiovascular specialist Dr. Brian Griffin, regularly every few months to chart the progress of her condition. Plaintiff also claims to have engaged in frequent monitoring of her blood pressure at home and work.

The records documenting plaintiff's blood pressure measurements over time

3

indicate some variability in blood pressure. On April 2, 2001, after the surgery, plaintiff's blood pressure was 106/70; on August 29, 2001, it was 150/90. On July 11, 2002, the date of the next measurement of record, it had risen to 170/82 in plaintiff's left arm, although, at that particular appointment, plaintiff noted that her blood pressure at home had measured consistently in the 110/60 range. The next measurement, taken about a year later on July 3, 2003, was 122/78. Dr. Slosky noted at that time that "from a cardiac standpoint, we have finally achieved some stability." (Pl.'s Statement of Facts Ex. A at STND655-00790.) He also recommended, however, that plaintiff should try to reduce her level of stress.

The periodic imaging procedures and scans, performed on plaintiff to measure the size of the descending aortic aneurysm, showed plaintiff's aneurysm to be stable in size. That is, the aneurysm, which on March 2001 and November 2001 measured 4.7 centimeters in size, increased to 5.0 centimeters by May 2002 but did not increase in size thereafter. The last scan noted in the administrative file for the relevant time period was performed September 15, 2003 and showed a stable descending aortic aneurysm measuring 5.0 centimeters.

Various events related to plaintiff's employment at MWF also occurred during this time period. In late 2000, plaintiff sought renewal of her contract, which was not set to expire until December 31, 2003. These negotiations stopped during her surgery and post-surgery recovery but resumed in the fall of 2001. After her surgery and into the summer of 2003, plaintiff pursued contract renewal with MWF. Additionally, in 2002, plaintiff made allegations of harassment against several of her MWF co-workers. These allegations included claims of verbal abuse. Plaintiff's physicians Dr. Griffin and Dr. Slosky, in letters

4

dated November and December 2002 respectively, noted that plaintiff should avoid verbal abuse and harassment. Dr. Eric Mass, a neurologist who had once treated plaintiff for a mild head injury, also noted in December 2002 that minimizing stress during contract negotiations should be a reasonable expectation. At that same time, plaintiff wrote a letter to Mike Kelly, counsel for MWF, noting that her medical condition left her fully functional. MWF conducted an investigation of plaintiff's legal allegations of harassment and determined that they lacked factual support.

MWF did not agree to the various contract proposals, and in the summer of 2003, MWF's personnel committee met to discuss plaintiff's future with the organization. Around this time, plaintiff submitted her disability claim. On September 12, 2003, a little over one month after plaintiff filed for disability benefits, the MWF board of directors voted against renewing plaintiff's contract. Plaintiff's employment contract and her coverage under the long-term disability benefits plan expired in December 2003.

## C. Plaintiff's Claim for Disability Benefits

Plaintiff filed a disability claim with Standard on August 6, 2003, claiming that she ceased work on August 7, 2003 due to aortic aneurysms and hypertension from work stress. Plaintiff's disability policy defined disability as follows:

### DEFINITION OF DISABILITY

During the Benefit Waiting Period and the Own Occupation Period you are required to be Disabled only from your Own Occupation.

You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy or Mental Disorder:

1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and

5

2. You suffer a loss of at least 20% in your indexed Predisability Earnings when working in your Own Occupation.

(Compl. Ex. A at 13.)

Standard reviewed the statements and evidence submitted by plaintiff and the records from her treating physicians, gave the file to a consulting physician, Dr. Theodore Kleikamp, for review and preliminarily denied plaintiff's claim on December 29, 2003, after it determined that plaintiff did not meet the Plan's definition of disability for the relevant time period. Standard soon after, however, on the advice of in-house physician Dr. Ronald Fraback, sought the input of independent cardiovascular specialists. Standard sent plaintiff's file to Dr. W. Kent Williamson and Dr. H. Storm Floten for an independent opinion as to plaintiff's disability. Both physicians concluded that plaintiff's blood pressure and aneurysm did not preclude her from performing her occupation. Thus, Standard issued an official initial denial of plaintiff's claim on March 31, 2004.

In June 2004, plaintiff notified Standard of her intent to appeal the initial denial. Subsequently, plaintiff claimed additional grounds for her disability, including psychological and cognitive impairment and fatigue, and she submitted evidence of these new claims as well as further documentation of her cardiovascular conditions. In addition to giving the new evidence to the physicians who previously consulted in the case, Standard also sent the new information to Dr. Esther Gwinnell, a psychiatric specialist, to analyze the new cognitive and emotional disability claims. Dr. Gwinnell reviewed the information and concluded that any cognitive or mental impairment plaintiff had did not rise to the level of a disability. Additionally, the consulting physicians found that the new information did not provide a basis for changing their initial opinions. The original claims analysts

6

subsequently determined that plaintiff still did not meet the definition of disability under the Plan. Pursuant to plaintiff's right to an internal review provided for in the Plan, the analysts then sent the file to Standard's QAU, which is responsible for internal appeals of determinations. The QAU reviewed plaintiff's file but ultimately agreed with the original analysts and concluded that plaintiff did not meet the definition of disability in the policy. On January 28, 2005, Standard issued its final denial.

I will state additional facts in the course of the opinion.

## II. RELEVANT LAW

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In weighing a summary judgment motion, I must construe evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A genuine issue of material fact exists if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Id. at 249. When both parties have moved for summary judgment, both are required to show that no genuine issues of fact exist, taking the facts in the light most favorable to the party opposing each motion. If issues of fact exist, neither party is entitled to summary judgment. Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt, 700 F.2d 341, 349 (7th Cir. 1983).

7

**B.     Arbitrary and Capricious Standard of Review**

Plaintiff has requested reconsideration of the standard of review in this case, suggesting that certain Seventh Circuit decisions support her assertion that de novo review is appropriate in this case rather than the arbitrary and capricious standard.  Specifically, plaintiff suggests that Schwartz v. Prudential Ins. Co. of Am., 450 F.3d 697 (7th Cir. 2006) and Sperandeo v. Lorillard Tobacco Co., 460 F.3d 866 (7th Cir. 2006), which found de novo review appropriate in light of policy language, undercut the validity of my prior decision to apply the arbitrary and capricious standard.  These cases, however, do not persuade me to change my prior decision.  Schwartz and Sperandeo turned on the fact that the only language arguably bestowing discretion upon the plan administrators was found in documents outside the plan.  Because the plan documents themselves did not contain any grants of discretion, the court found that the insured was not put on notice that the plan administrator would be exercising unfettered discretion in claim determinations.  However, in the present case, the policy itself, rather than an extraneous document, contained the language that I found conferred discretion on the plan administrator.  Therefore, I see no reason to change my initial decision settling upon the arbitrary and capricious standard of review.

In the context of this summary judgment motion, the ultimate question I am called upon to resolve is whether a reasonable factfinder could conclude, based on the evidence, that Standard's decision to deny plaintiff long-term disability benefits was in fact arbitrary and capricious. Under the arbitrary and capricious standard, Standard's decision to deny benefits

should not be overturned if (1) it is possible to offer a reasoned explanation,

8

based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) [Standard] has based its decision on a consideration of the relevant factors that encompass important aspects of the problem.

Militello v. Cent. States SE & SW Areas Pension Fund, 360 F.3d 681, 686 (7th Cir.2004).

I may not substitute my judgment for Standard's judgment. Instead, I must determine whether, in light of the relevant facts and policy language, Standard "articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins., 463 U.S. 29, 43 (1983); see also Smart v. State Farm Ins. Co., 868 F.2d 929, 936 (7th Cir.1989). In the absence of such a satisfactory explanation, a genuine issue of material fact exists as to whether the denial of benefits was arbitrary and capricious.

### III. DISCUSSION

To determine whether Standard's decision to deny disability benefits was arbitrary and capricious, I must examine the evidence in the administrative record and analyze whether it has a rational connection to the explanation offered by Standard. In plaintiff's case, Standard considered several different categories of evidence, including medical evidence, evidence of employment-related events and Standard's own interpretation of relevant policy language. I will address each of these categories in turn, analyze whether the evidence supports Standard's decision and consider plaintiff's arguments that Standard did in fact act arbitrarily and capriciously.

### A.    Evidence in the Record

#### 1.    Medical Evidence

In its letters to plaintiff's attorney explaining the initial and final decisions denying

9

benefits, Standard cited to the opinions of five physicians, each of whom reviewed the medical records and reports submitted by plaintiff's treating physicians and ultimately concluded that plaintiff was not disabled. While in some cases courts have found an administrator's reliance on a non-examining, consulting physician's opinion unreasonable, see, e.g., Hawkins v. First Union Corp. Long-Term Disability Plan, 326 F.3d 914, 918-19 (7th Cir. 2003), the general rule governing disability determinations under plans covered by ERISA is that a treating physician's opinion deserves no more deference than a purely consulting physician's opinion. Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Thus, Standard's reliance on consulting physicians is quite acceptable. Further, under the arbitrary and capricious standard of review, it is not my job to choose between conflicting opinions of medical experts; rather, that is a matter left to the judgment of Standard as the claims administrator. See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974); Semien v. Life Ins. Co. of N. Am., 436 F.3d 805, 812 (7th Cir. 2006).

In the present case, the consulting physicians who considered plaintiff's cardiovascular condition examined the records and reports provided by Dr. Slosky and Dr. Griffin. They looked at blood pressure measurements in the normal range, taken just one month before the claimed date of disability. They looked at a descending aortic aneurysm that had not grown a fraction of a centimeter in over a year, despite alleged hypertension and stress. They looked at statements by Dr. Slosky, made just one month before plaintiff filed her disability claim, that plaintiff's cardiovascular condition was stable and asymptomatic. They looked at all the other medical evidence and concluded, based on their medical judgment and expertise, that while plaintiff's condition warranted treatment

10

and monitoring, the evidence did not indicate that it presented such a "clear and present danger to [her] health and life" (Pl.'s Resp. to Mot. for Summ. J. at 18.) that she could not continue to perform a job like MWF Executive Director.

Specifically, Drs. Williamson, Floten and Kleikamp all pointed to the series of imaging procedures performed on plaintiff to measure the size of the descending aortic aneurysm. These test results demonstrated that except between November 2001 and May 2002 when the aneurysm increased from 4.7 centimeters to 5.0 centimeters, plaintiff's descending aortic aneurysm was stable and unchanging and, indeed, between May 2002 and September 2003, the aneurysm did not increase in size. The physicians opined that this stability contradicted the assertion that stress and hypertension adversely affected plaintiff's vascular health. Additionally, Dr. Kleikamp referred to the fact that on July 11, 2002, plaintiff reported to Dr. Slosky that her blood pressure had been measuring at normal levels in the 110/60 range, and that at the next appointment on July 3, 2003, plaintiff's blood pressure measured 122/78.[1] Dr. Kleikamp was "struck by the inconsistencies" between these measurements, as well as Dr. Slosky's contemporaneous comments noting the stability of plaintiff's condition, and the suggestion in Dr. Slosky's letter dated October 3, 2003, after plaintiff filed her disability claim, that plaintiff should have ceased work as of July 13, 2003 because of poor blood pressure control. (Pl.'s Statement of Facts Ex. A at STND655-00938.)

Regarding plaintiff's claims of cognitive disability, Dr. Gwinnell reviewed the

_____

[1]It is interesting to note that this particular appointment took place in the middle of Summerfest, by far the largest festival MWF organizes and the one that is the most stressful from a managerial standpoint. Summerfest ran from June 26, 2003, to July 6, 2003.

11

evidence submitted by plaintiff for the initial claim as well as additional material submitted throughout the claims review process. This material included session notes from plaintiff's psychiatrist, Dr. Michael Deeken; information from Dr. Maas; and results from cognitive tests performed by Dr. Hammeke in August 2004. Dr. Gwinnell concluded, after reviewing these records as well as affidavits from plaintiff's family and friends regarding her cognitive condition after her surgery, that the evidence did not support a finding of cognitive disability. She noted that the affidavits from family and friends describing plaintiff's physical, cognitive and emotional difficulties since her March 2001 surgery, were contradicted by the medical records. Contrary to the claims that plaintiff suffered from severe fatigue since the 2001 surgery, Dr. Slosky's records did not note any fatigue until 2004, after plaintiff's eligibility under the Plan expired. Additionally, Dr. Gwinnell opined that the cognitive test results generally suggested average to superior cognitive function, with at most a mild impairment in a narrow range of cognitive skills. Moreover, this testing was not performed until August 2004, well after plaintiff's coverage under the Plan expired, and there was no indication in the record prior to that date of any cognitive difficulties. And as for plaintiff's diagnosed depression and anxiety, while admitting that the record showed that plaintiff did indeed suffer from these disorders, Dr. Gwinnell pointed to the fact that nowhere in Dr. Deeken's records did he indicate, imply or suggest that these conditions ever interfered with plaintiff's ability to perform her job. Therefore, based on all the evidence and her medical experience and expertise, Dr. Gwinnell concluded that plaintiff's cognitive and emotional difficulties did not prevent her from performing her job.

Additionally, Standard itself reviewed plaintiff's physicians' records and emphasized the discrepancies between the clinical records and the letters written after plaintiff filed for

12

disability benefits. For example, none of plaintiff's physicians ever recommended work restrictions outside of the initial six-week post-operative recovery period until after plaintiff filed for disability; at most, they suggested that plaintiff should not be subjected to verbal abuse and harassment. Moreover, the medical records between the date of surgery and the claimed date of disability did not indicate a worsening of plaintiff's condition that would justify the abrupt change in the physicians' opinions pre- and post-claim. Plaintiff's aneurysm remained stable in size, and her blood pressure, while variable, measured at normal levels during the year before she filed her claim. Thus, these discrepancies, when combined with the nearly identical conclusions drawn by five different consulting physicians, including three independent specialists, led Standard to conclude that plaintiff was not disabled.

This analytical process is quite different than the process that took place in Hawkins. There, the only evidence supporting the administrator's decision to deny benefits was an incorrect presumption and a single consulting physician, whose opinion was based on the most generic and superficial analysis one could imagine, while the medical evidence in favor of the insured's claim was substantial. Here, on the other hand, the consulting physicians analyzed the evidence specific to plaintiff's claim. The conclusions they reached were not far-fetched, and it was entirely reasonable for Standard to rely on those conclusions. Additionally, the records of the treating physicians did not consistently support a finding of disability, a fact that further distinguishes this case from Hawkins. [2]

---

[2] Plaintiff cites to other cases as well to support her position, but for similar reasons, such as the consistency of the evidence offered by treating physicians or the superficiality of the analysis conducted by a consulting physician, those cases are distinguishable from plaintiff's situation. See, e.g., Moon v. Unum Provident Corp., 405 F.3d 373 (6th Cir.

13

Thus, Standard's ultimate decision to deny benefits is reasonably supported by the medical evidence in the record.

### 2. Employment-Related Evidence

Standard also relied on evidence of the circumstances of plaintiff's employment at MWF, leading up to and just after plaintiff's claim for disability, which arguably cast doubt on plaintiff's motives for filing for disability benefits at the time she did so. Specifically, Standard noted that plaintiff sought a contract extension beginning in late 2000 and continuing into the summer of 2003. In the course of this pursuit, plaintiff herself stated in a letter dated December 2, 2002 to Summerfest counsel Mike Kelly that her cardiovascular condition "allows [her] to be fully functional at this time, but . . . is reactive to stress, not the day-to-day operational kind, but the unnecessary stress that comes from degrading, disparaging and harassing conduct" (Pl.'s Statement of Facts Ex. A at STND655-07700.) and that she was "asking for a five year contract . . . and to be treated in non-threatening, non-harassing way, and in a way that does not add unnecessary stress . . . ." (Id. at STND655-01096.) She further stated that she "has recovered from a life threatening situation, and [is] a very happy soul." Id. Plaintiff's treating physicians assisted plaintiff in her efforts, providing letters in November and December 2002 opining not that she should stop working but merely that she should avoid verbal harassment or abuse at work and during negotiations. Plaintiff provided these letters to MWF in her attempt to secure a contract extension.

In the end, MWF did not accept plaintiff's contract proposals, and rumors began

_____

2005); Kosiba v. Merck & Co., 384 F.3d 58 (3d Cir. 2004).

circulating in the spring of 2003 that MWF would not renew her contract at all. Plaintiff's relationship with some members of the board of directors had been deteriorating for quite some time. Also in the spring of 2003, MWF hired an independent consultant to conduct a study of how the MWF organization functioned, which included studies and employee surveys about management. The results of these studies and surveys did not reflect favorably on plaintiff, lending more support to the suggestion that plaintiff's contract would not be renewed. MWF's personnel committee, comprised of four directors, scheduled a meeting to discuss plaintiff's future, and certain evidence suggested that plaintiff knew that this meeting would not go well for her. Plaintiff filed her disability claim at about this time, and it was only after she knew that her contract would not be renewed that plaintiff's physicians wrote their letters opining plaintiff could no longer work.

Granted, plaintiff is correct that her attempt to keep working and to secure a contract extension does not defeat her claim of disability on its own.[3] Here, however, Standard did not merely consider the fact that plaintiff continued to work and to seek a new contract. Rather, it also considered the timing of plaintiff's abrupt decision to stop working and to file for disability benefits in light of the evidence suggesting plaintiff knew she was about to lose her job, and it reasonably concluded that this evidence suggested a motive other than disability for filing for benefits under the Plan.

### 3.    Standard's Interpretation of Policy Language

---

[3] Plaintiff cites to <u>Hawkins</u> to support this principle. 326 F.3d at 917-18. However, plaintiff's situation differs from the facts in <u>Hawkins</u> in that the plan administrator there denied the insured's claim on the basis of only two pieces of evidence, one of which was the fact that the insured continued to work after filing his claim. Plaintiff's ongoing performance and contract pursuits, on the other hand, comprised just a small fraction of the evidence on which Standard relied.

15

Standard's decision also turned on its interpretation of key terms in the Plan documents. Particularly, Standard, utilizing the discretion conferred on it by the Plan to interpret policy language, clarified the definitions of the phrases "Own Occupation" and "Material Duties."

First, Standard conducted an analysis to determine what plaintiff's Own Occupation entailed. Own Occupation, in the policy, is defined as

> any employment, business, trade, profession, calling or vocation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your Employer, but we may also look at the way the occupation is generally performed in the national economy.

(Compl. Ex. A. at 14.) Standard conducted a vocational analysis to define the parameters and characteristics of plaintiff's Own Occupation, initially settling upon the top executive position of "Recreation Director" in the light work classification. After plaintiff submitted her own vocational analysis performed by John Sargent, Standard revised its classification of plaintiff's Own Occupation to that of "President, any industry." This also fell in the sedentary to light work category of occupations, as defined by the U.S. Department of Labor Dictionary of Occupational Titles. Standard emphasized that the ability to perform one's Own Occupation means the ability to perform any occupation of the same general character in the national economy, not just one's own particular job. Thus, even if plaintiff hypothetically could not perform her job as Executive Director for MWF, to meet the definition of disability under the relevant policy language, she also would have to be unable to perform jobs of a generally similar character across the country.

Standard also interpreted the definition of "Material Duties" in the context of the

16

Executive Director position at MWF. In the policy, Material Duties is defined as "the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted." Id. Standard interpreted this definition in light of plaintiff's occupation to conclude that the Material Duties of the Executive Director position at MWF consisted of

> the general day to day management of Festival affairs including supervision of employee personnel in accordance with policies established by the Board of Directors; responsibility for confirming that the orders and resolutions of the Board of Directors are carried into effect; responsibility for fund raising, both general sponsor tickets and the presale ticket and other campaigns; budgeting; responsibility for maintaining liaison with and the contractual supervision of the ethnic festivals, lake front festivals and other special events groups; responsibility for fund raising for the amphitheater and the supervision thereof; and responsibility for reporting to the president and the Board of Directors.

(Pl.'s Statement of Facts Ex. A at STND655-01119 to -01120.)

Standard also concluded that the contentious contract negotiations and the deteriorating relationship between plaintiff and MWF were not a part of the Material Duties of her Own Occupation, but were a unique aspect of her work at MWF. Additionally, Standard noted that nothing in the record indicated that plaintiff experienced stress from performing her everyday functions – the Material Duties – of her job, and plaintiff herself stated earlier that she was not affected by the day-to-day kind of stress. Standard concluded that plaintiff's stress arose from the contract negotiations and conflict with the officers, directors, and employees of MWF. Thus, even though that stress might preclude plaintiff from continuing to work for MWF, it did not prevent her from performing the Material Duties of her Own Occupation for another employer in Milwaukee or elsewhere.

17

I find that this is a reasonable interpretation of the plain language of the Plan. Given the fact that plaintiff's problems at MWF arose not from the nature of the Executive Director position but from interpersonal conflict with specific MWF personnel, it was not unreasonable to conclude that the conflict and contention that accompanied plaintiff's job were not an essential part of that job. And in light of the provision stating that Own Occupation was not limited to plaintiff's particular job, it also was reasonable to conclude that plaintiff could perform a similar job for another employer, leaving behind the conflict and contention specific to MWF.

Thus, based on the conclusions of four independent physicians and an in-house physician that plaintiff's cardiovascular and cognitive conditions did not prevent her from performing her job as of the date range when she was eligible for benefits; on inconsistencies in the medical records, reports, and letters submitted by plaintiff's treating physicians; on the circumstances of plaintiff's employment up to the date plaintiff ceased employment with MWF; and on its reasonable and discretionary interpretation of Plan language, Standard concluded that plaintiff did not meet the definition of disability. I cannot say that this conclusion, supported by an in-depth analysis of plaintiff's records and consultation with five separate physicians, including three different specialists, lacks a rational connection to the facts, nor can I say that Standard failed to provide a satisfactory explanation for its decision. I therefore cannot conclude that Standard acted arbitrarily or capriciously in its decision to deny plaintiff's claim for disability benefits.

**B. Plaintiff's Arguments that Standard's Decision was Arbitrary and Capricious**

    **1. Full and Fair Review**

Plaintiff argues generally that Standard failed to provide her with the "full and fair" review required by ERISA. That process requires a full examination of all evidence on the record; consideration of all aspects of the claim and condition in question; the opportunity for the insured to respond to the initial decision and to submit additional information in support of her claim; and reconsideration of the decision in light of the new evidence submitted by the insured. Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir. 1992). It is undisputed that plaintiff was allowed to submit additional evidence in support of her claim during the review process, but plaintiff suggests that Standard, during the entire process, failed to consider all the evidence and every aspect of her condition.

First, plaintiff argues that Standard failed to consider properly her physician's reports and rebuttal evidence and therefore did not fully examine all evidence. The record does not support this assertion. Standard and the consulting physicians fully examined the treating physicians' records in forming their own conclusions, and expressly cited to different portions of those records in explaining their analytical process. To the extent plaintiff is suggesting that Standard did not give enough weight to the treating physicians' records and reports, that issue is not relevant to this analysis under the arbitrary and capricious standard of review.

Second, plaintiff asserts that the consulting physicians failed to properly consider stress as a factor in their analysis, that Standard failed to consider plaintiff's evidence of cognitive impairments and fatigue, and that therefore Standard failed to consider all aspects of her claim and condition. Again, the record does not support this assertion. The consulting physicians expressly factored stress into their analysis, but ultimately concluded that the evidence did not show that work-related stress increased the risks that the

19

aneurysm would rupture. They emphasized the fact that plaintiff's aneurysm remained stable in size and that plaintiff's own physician characterized her condition as stable and asymptomatic just one month before she filed for disability. Additionally, the record shows that Standard did not disregard plaintiff's claims and evidence of cognitive disability and fatigue. Rather, Standard sought the opinion of a consulting physician specifically for the purpose of assessing the level of plaintiff's cognitive impairment and fatigue.

Third, plaintiff suggests that Standard utilized an improper vocational analysis in its benefit eligibility determination, claiming that Standard classified her position as Executive Director as something akin to recreational director when it is more like a CEO of a major corporation. The record, however, shows that while Standard in its initial decision did utilize the "recreational director" classification in assessing whether plaintiff was disabled relevant to her Own Occupation, upon objection by the plaintiff to its initial classification, Standard reconsidered and adjusted its analysis to reflect the more appropriate occupational classification of "President, any industry."

### 2. Other Disability Awards

Plaintiff claims that her award of Social Security disability benefits should be strong evidence against Standard's ultimate decision to deny her claim, but I find this argument unpersuasive. The Social Security Administration is a national system of welfare and disability that has enacted its own rules for administering and interpreting claims. For example, in determining whether a claimant is disabled, the Social Security Administration's claims examiners generally give a treating physician's findings and reports more weight than a consulting, non-examining physician, absent reason to proceed otherwise. 20 C.F.R. § 404.1527(d)(1), (2). This rule, however, does not factor into

20

disability determinations in plans covered by ERISA.[4]  <u>Black & Decker</u>, 538 U.S. at 834.

Thus, different rules apply in the context of Social Security disability than in the context of

an employer's group welfare benefit policy under ERISA.[5]  Moreover, the Social Security

analyst relied on different information, opinions and records than the analysts at Standard.

Therefore, the disability award by the Social Security Administration is not controlling in this

case.

      The overarching theme of plaintiff's arguments is that Standard improperly weighed

the evidence in its decision to deny her claim for benefits; however, that assertion is

irrelevant to the question at hand.  Rather, I must determine whether a reasonable

factfinder could conclude that Standard's ultimate denial of benefits lacked rational

support.  The record shows that plaintiff's nearly twenty-year tenure as Executive Director

of MWF was about to come to a crashing halt and that plaintiff was aware of this fact.  The

record shows that plaintiff suffered from variable hypertension and a descending aortic

aneurysm, but it also shows that the aneurysm was not growing in size and that plaintiff's

hypertension in the year before her disability claim was increasingly stable.  The record

does not reflect any suggestion or advice by plaintiff's physicians that she stop working,

outside of the initial post-operative recovery period, until after plaintiff filed for disability

---

[4]Plaintiff also suggests that the consulting physicians reports warrant less deference than her treating physicians' reports, but <u>Black & Decker</u> contradicts this assertion.  The Court in that case noted that no "treating physicians rule" applies in the context of ERISA plans and that plan administrators are not required to weigh a treating physician's reports more or less deferentially than a consulting, non-examining physician's reports.

[5]For similar reasons, the disability award by plaintiff's private insurer, Paul Revere Insurance Company does not render Standard's decision arbitrary and capricious. Different plans have different rules, definitions, and requirements.  One can imagine that a private insurance plan might differ greatly from an employer's group policy.

benefits and after she knew her contract would not be renewed. On the contrary, the record indicates physicians who endorsed plaintiff's pursuit of contract negotiations and continued employment, at most suggesting only a limitation on the amount of direct, hostile confrontation to which plaintiff should be exposed. But, as Standard noted in its authorized interpretation of the terms of the policy, the conflict between plaintiff and the officers, directors, and employees of MWF was not part of the Material Duties of her Own Occupation. After considering the evidence contained in the administrative record, I conclude that Standard's decision was reasonably supported by the evidence in the record, turned on a reasonable interpretation of plan documents, considered the important aspects of the problem in reaching a reasonable conclusion and, therefore, was not arbitrary and capricious.

## IV. CONCLUSION

**THEREFORE**, for the reasons stated,

**IT IS ORDERED** that plaintiff's motion for summary judgment is **DENIED**.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment is **GRANTED,** and this case is **DISMISSED**.

Dated at Milwaukee, Wisconsin this 27th day of September, 2007.


/s_____
LYNN ADELMAN
District Judge

22